'09 CIV 01043

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

SECURITIES AND EXCHANGE COMMISSION,

                    **Plaintiff,**

                    **v.**

**NICOS ACHILLEAS STEPHANOU,**
**RAMESH CHAKRAPANI,**
**ACHILLEAS STEPHANOU,**
**GEORGE PAPARRIZOS,**
    **a/k/a GEORGIOS PAPARRIZOS,**
**KONSTANTINOS PAPARRIZOS,**
**MICHAEL G. KOULOUROUDIS, and**
**JOSEPH CONTORINIS,**

                **Defendants.**

: 
: 
: 
: 
: 
: 
: 
: 
: **Civil Action No. 09-cv-**
: 
: 
: 
: 
: 
: 

---

## COMPLAINT

Plaintiff Securities and Exchange Commission (the "Commission") alleges as follows:

### SUMMARY

1.      This case involves unlawful insider trading conducted from at least November 2005 through December 2006 by two mergers and acquisitions professionals - - Nicos Achilleas Stephanou ("Stephanou") at UBS Investment Bank ("UBS") and Ramesh Chakrapani ("Chakrapani") at Blackstone Advisory Services, L.P. ("Blackstone") -- a portfolio manager for a Jefferies Group, Inc. ("Jefferies") hedge fund, Joseph Contorinis ("Contorinis"); and at least four other individuals. By virtue of their employment at their financial advisory firms, Stephanou and Chakrapani were privy to highly confidential information concerning mergers and acquisitions. Notwithstanding

their agreements and duties to maintain the confidentiality of this information, they tipped other individuals and each other with nonpublic information about impending corporate acquisitions. The individuals they tipped then traded in the securities of the acquired companies based on this information and in advance of public disclosure of the acquisitions, tipped family members and/or traded in accounts in their family members' names, generating a combined total of over $8 million in illegal profits and losses avoided.

2.      Specifically, this insider trading ring involved Stephanou and Chakrapani, who are friends and former colleagues from their prior employment at another financial advisory firm, and Stephanou's: friend and former colleague, Contorinis, a portfolio manager for the Jefferies Paragon Fund ("Paragon Fund"); father, Achilleas Stephanou ("A. Stephanou"); former classmate, George Paparrizos ("G. Paparrizos") and his father, Konstantinos Paparrizos ("K. Paparrizos"); and close family friend, Michael Koulouroudis ("Koulouroudis") (collectively, the "tippees").

3.      Stephanou and all of the tippees engaged in unlawful insider trading ahead of the announcement of the acquisition of Albertson's Inc. ("ABS"). Cerberus Capital ("Cerberus"), one of the companies that eventually acquired ABS, retained UBS as its financial advisor in connection with the acquisition. Stephanou was a member of the team at UBS that advised Cerberus on the acquisition and, therefore, was privy to material nonpublic information about the acquisition of ABS prior to its public release.

4.      Stephanou tipped G. Paparrizos, Koulouroudis and Contorinis with material nonpublic information regarding the ABS acquisition, all of whom traded on the basis of that information. Stephanou also either tipped his father, A. Stephanou, or in an

effort to evade detection, Stephanou traded ABS securities in his father's brokerage account. In addition, Stephanou either tipped K. Paparrizos or, in an effort to evade detection, G. Paparrizos traded ABS securities in his father's account. Further, Koulouroudis, who is authorized to exercise control over four family accounts, either tipped four family members with the material nonpublic information, who traded in the accounts, or traded in their accounts on their behalf on the basis of the material nonpublic information. By virtue of this trading in ABS securities, the tippees made total profits and avoided losses of approximately $7.7 million.

5.      Stephanou, A. Stephanou, G. Paparrizos, K. Paparrizos, and Koulouroudis also engaged in unlawful insider trading ahead of the announcement of the acquisition of ElkCorp ("ELK"). ELK hired UBS as its financial advisor in connection with the potential acquisition. Through working on the deal himself, through communications with other employees at UBS who advised ELK on the acquisition, and/or by virtue of his access to UBS' internal files, Stephanou had access to material nonpublic information about ELK's impending acquisition.

6.      Stephanou tipped G. Paparrizos and Koulouroudis with material nonpublic information regarding the ELK acquisition, both of whom traded on the basis of that information. Stephanou also either tipped A. Stephanou and K. Paparrizos about the material nonpublic information about ELK or, in an effort to evade detection, Stephanou traded in A. Stephanou's account and/or G. Paparrizos traded in K. Paparrizos' account. Further, Koulouroudis either tipped four family members with the material nonpublic information or traded in their accounts on the basis of the material nonpublic information. By virtue of this trading in ELK securities, A. Stephanou, G. Paparrizos, K. Paparrizos,

and Koulouroudis and his family members made total profits of approximately $300,000.

7.     In addition, Chakrapani, Stephanou, A. Stephanou and Koulouroudis engaged in unlawful insider trading ahead of the announcement of a potential acquisition of National Health Investors, Inc. ("NHI"). NHI retained Blackstone as its financial advisor in connection with the potential acquisition. Chakrapani was a member of the team at Blackstone that advised NHI on its potential acquisition and, therefore, was privy to material nonpublic information about the potential NHI acquisition.

8.     Chakrapani tipped Stephanou with material nonpublic information regarding the potential NHI acquisition, who in turn tipped Koulouroudis with that information. Koulouroudis traded in NHI securities on the basis of that information. In addition, Stephanou also tipped A. Stephanou or, in an effort to conceal his own trading, Stephanou traded in A. Stephanou's account on the basis of that information. Moreover, Koulouroudis either tipped four family members with that information or traded in their accounts on the basis of that information. By virtue of this trading in NHI securities, A. Stephanou, Koulouroudis and his family members made total profits of approximately $17,000.

9.     By knowingly or recklessly engaging in the conduct described in this Complaint, Defendants Stephanou, A. Stephanou, G. Paparrizos, K. Paparrizos, and Koulouroudis violated, and unless restrained and enjoined will continue to violate, Section 17(a) of the Securities Act of 1933 ("Securities Act") [15 U.S.C. § 77q(a)] and Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. § 78j(b)], and Rule 10b-5 [17 C.F.R. § 240.10b-5], thereunder. In addition, by knowingly or recklessly engaging in the conduct described in this Complaint, Defendants

4

Chakrapani and Contorinis violated, and unless restrained and enjoined will continue to violate, Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)], and Rule 10b-5 [17 C.F.R. § 240.10b-5], thereunder.

### JURISDICTION AND VENUE

10.     The Commission brings this action pursuant to Section 20(b) of the Securities Act [15 U.S.C. § 77t(b)], and Sections 21(d) and 21A of the Exchange Act [15 U.S.C. §§ 78u(d) and 78u-l], to enjoin such transactions, acts, practices, and courses of business, and to obtain disgorgement, prejudgment interest, civil money penalties and such other and further relief as the Court may deem just and appropriate.

11.     This Court has jurisdiction over this action pursuant to Sections 20(b) and 22(a) of the Securities Act [15 U.S.C. §§ 77t(b) and 77v(a)] and Sections 21(d), 21(e), 21A and 27 of the Exchange Act [15 U.S.C. §§ 78u(d), 78u(e), 78u-1 and 78aa].

12.     Venue in this district is proper under Section 22(a) of the Securities Act [15 U.S.C. § 77v(a)] and Section 27 of the Exchange Act [15 U.S.C. § 78aa]. Certain of the transactions, acts, practices, and courses of business constituting the violations alleged herein occurred within the Southern District of New York and elsewhere, and were effected, directly or indirectly, by making use of the means or instruments or instrumentalities of transportation or communication in interstate commerce, or of the mails, or the facilities of a national securities exchange.

### DEFENDANTS

13.     Nicos Achilleas Stephanou, age 34, resides in London, England and is a citizen of Cyprus. Following his arrest on December 27, 2008, Stephanou has been incarcerated at the Metropolitan Correctional Center in New York, New York. Since

2002, Stephanou has been employed by UBS and associated with UBS Securities, LLC, a registered broker-dealer in the United States. Most recently, he was an Associate Director of Mergers and Acquisitions in UBS' London office. Stephanou worked in UBS' New York City office before transferring to its London office in July 2006. He has been a registered representative since August 26, 2002. Stephanou previously worked as an analyst in the New York City office of Credit Suisse First Boston from July 1998 through June 2000.

14. <u>Ramesh Chakrapani</u>, age 33, resides in London, England and is a citizen of the United States. Following his arrest on January 12, 2009, he has been temporarily residing in Cerritos, California. Since 2001, Chakrapani has been employed by Blackstone, a financial advisory services firm and registered broker-dealer in the United States. Chakrapani was most recently a Managing Director in the Corporate and Mergers and Acquisitions Advisory group in Blackstone's London office. Chakrapani worked in Blackstone's New York City office from in or about 2001 through in or about 2008, before transferring to its London office. Chakrapani has been a registered representative since April 1, 2001. Chakrapani was suspended from his employment at Blackstone on January 13, 2009, following his arrest. Chakrapani previously worked as an analyst at the New York City office of Credit Suisse First Boston from July 1997 through July 1999. A period of his employment at Credit Suisse First Boston overlapped with that of Stephanou, with whom he became friends.

15. <u>Achilleas Stephanou</u>, age 64, is Stephanou's father, a citizen of Cyprus, and currently resides in Nicosia, Cyprus. During the relevant time period, A. Stephanou maintained a brokerage account at Charles Schwab. The account documents for this

account indicate that: A. Stephanou and his "son" called Charles Schwab on or about January 19, 2005, to ask how to set-up a password and wire $85,000 into the account; account notifications were requested to be sent to Stephanou's e-mail address; and, in January 2007, Stephanou instructed Charles Schwab to wire approximately $29,000 from the brokerage account to an account in his name at a bank in Jersey, a Channel Island off the coast of Normandy. The header from the facsimile requesting the wire transfer indicated that the request was coming from UBS. Additionally, in December 2006, a check in the amount of $18,000 was issued to Stephanou from A. Stephanou's account at Charles Schwab, and deposited into a bank account located in the Isle of Man. In addition, from in or about May 2007 through in or about February 2008, internet protocol ("IP") addresses show that an individual accessed A. Stephanou's account using a computer at the London office of UBS where Stephanou worked during this period of time. Accordingly, Stephanou exercised control over A. Stephanou's account and may have executed trades for A. Stephanou, or traded in the account, himself, for his own benefit in an effort to conceal his trading.

16.     George Paparrizos a/k/a Georgios Paparrizos, age 37, is a former classmate of Stephanou's from the University of California at Berkeley. G. Paparrizos currently resides in Foster City, California, is a citizen of the United States and is a senior product marketing manager at a technology company. During the relevant time period, G. Paparrizos maintained a brokerage account at E*Trade.

17.     Konstantinos Paparrizos, age 77, is the father of G. Paparrizos and currently resides in Athens, Greece. K. Paparrizos is a citizen of Greece. During the relevant time period, K. Paparrizos maintained a brokerage account at TD Ameritrade.

During the relevant time period, the vast majority of the IP address log-ons to K. Paparrizos' account originated from Northern California, where G. Paparrizos resides, including at least one IP address log-on from G. Paparrizos' former place of employment. Accordingly, G. Paparrizos exercised control over K. Paparrizos' account and may have executed trades for K. Paparrizos, or traded in the account, himself, for his own benefit in an effort to conceal his trading.

18.      Michael Koulouroudis, age 58, is a close family friend of Stephanou and currently resides in Brooklyn, New York. Koulouroudis maintains dual citizenship in the United States and Greece. According to brokerage account opening documents, Koulouroudis had trading authority over five related brokerage accounts at Charles Schwab in his name and the names of various family members (collectively referred to as the "Koulouroudis accounts"). These accounts were in the following names: (1) Michael Koulouroudis as Custodian for J. Koulouroudis; (2) Michael Koulouroudis as Custodian for N. Koulouroudis, subsequently Nicholas M. Koulouroudis and Michael G. Koulouroudis jointly; (3) Margarita Koulouroudis and Michael Koulouroudis jointly; (4) Michael Koulouroudis; and (5) George Michael Koulouroudis and Michael Koulouroudis jointly.

19.      Joseph Contorinis, age 44, was a Managing Director at Jefferies & Company, Inc. from February 2004 through February 2008. Jefferies & Company, Inc. is the principal operating company of Jefferies and is a registered broker-dealer, headquartered in Los Angeles, California with offices throughout the United States. Upon information and belief, Contorinis worked in the Stamford, Connecticut office of Jefferies. Contorinis was a portfolio manager for, and directed trading in and on behalf

8

of, the Paragon Fund, which was, upon information and belief, created and funded by Jefferies. Contorinis currently resides in Fort Myers, Florida and is a citizen of the United States. Contorinis was a registered representative from February 10, 2004 through February 26, 2008, while at Jefferies, and was associated with an investment adviser while employed by Jefferies. He is not currently registered in any capacity with a broker-dealer. Prior to his employment at Jefferies, Contorinis was employed at UBS during a period of time that overlapped Stephanou's employment there and they became friends.

**OTHER RELEVANT ENTITY**

20.     <u>Jefferies Paragon Fund</u> was, upon information and belief, a hedge fund created by Jefferies Group, Inc. and funded by outside investors and Jefferies. The Paragon Fund was managed by Jefferies Asset Management, LLC, a registered investment adviser. During the relevant time period, the Paragon Fund maintained a brokerage account at Morgan Stanley & Co., Inc. Upon information and belief, Contorinis was a portfolio manager for, and directed trading in and on behalf, and for the benefit, of the Paragon Fund. Upon information and belief, the Paragon Fund was closed in June 2007.

**FACTS**

I.      **Insider Trading Ahead of the ABS Acquisition**

    A.      **Stephanou Possessed Material Nonpublic Information about the ABS Acquisition**

21.     Prior to its acquisition, ABS, headquartered in Boise, Idaho, was a supermarket retailer, operating grocery stores across the western United States. ABS common stock was traded on the New York Stock Exchange under the ticker symbol,

9

"ABS." In the six months prior to its announcement on January 23, 2006, that it would be acquired, the daily trading volume in ABS stock averaged 6,056,162 shares and the daily stock price averaged $23.15 per share.

22.     In early 2005, ABS retained Blackstone to assist it during its consideration of strategic alternatives. On July 14, 2005, ABS' board of directors instructed Blackstone to solicit preliminary indications of interest from potential acquirers.

23.     In August 2005, Cerberus, a private equity firm, approached ABS and expressed its interest in exploring a potential acquisition of ABS. Cerberus hired UBS to serve as its financial advisor. UBS subsequently entered into negotiations with ABS on behalf of Cerberus.

24.     UBS assigned Stephanou to work on the ABS acquisition. UBS also assigned another individual employed at UBS to the team advising Cerberus regarding the potential acquisition ("Executive Director").

25.     From on or about October 25, 2005 through on or about October 27, 2005, Stephanou placed telephone calls on his mobile telephone from Boise, Idaho, which was the headquarters of ABS. On or about December 7, 2005, Stephanou also spoke by telephone with the Executive Director.

26.     As part of his participation on the Cerberus deal team, Stephanou learned material nonpublic information about ABS' acquisition and negotiations surrounding it prior to the public announcement.

27.     Upon information and belief, UBS agreed to maintain in confidence all information related to Cerberus' exploration of an acquisition of ABS. Because UBS owed a duty to maintain the confidentiality of information provided to it by its clients,

such as Cerberus, upon information and belief, in the policies and procedures UBS distributed to employees, UBS included policies and procedures mandating that each employee maintain in strict confidence information concerning its clients.  In its Code of Business Conduct and Ethics, UBS notes that "UBS is committed to upholding client confidentiality and protecting client information," is "committed to the proper handling of inside information" and that it "does not use information for any purposes other than those for which this information has originally been given to [UBS]."  In addition, upon information and belief, UBS' policies prohibited employees from using confidential information obtained during the course of employment when trading in their own account or someone else's account, or disclosing the information to others.  Stephanou was aware that he owed a duty to maintain the confidentiality of information provided to him and UBS by the firm's clients, including Cerberus, and abstain from trading based on that information or disclosing that information to others.

**B.   Stephanou Tipped his Friends and Relative with Material Nonpublic Information Regarding the ABS Acquisition, Each of Whom Traded**

28.   After hiring UBS as its financial advisor, in late October 2005, Cerberus formed a consortium with Supervalu.  Soon thereafter, the Cerberus-Supervalu consortium began an in-depth due diligence process into a possible acquisition of ABS and, on November 16, 2005, the consortium participated in a due diligence meeting.

29.   On November 17, 2005, Stephanou called Koulouroudis at 6:42 p.m. for six minutes.  The next day, November 18, 2005, the Koulouroudis accounts, A. Stephanou and the K. Paparrizos account began to purchase the following amounts of ABS stock:

| Individual | Date | Number of Shares Purchased | Average Price |
| --- | --- | --- | --- |
| Koulouroudis | 11/18/05 | 12,575 | $24.69 |
| Koulouroudis | 11/21/05 | 1,000 | $24.53 |
| Koulouroudis | 11/22/05 | 2,000 | $24.60 |
| A. Stephanou | 11/22/05 | 10,000 | $24.77 |
| Koulouroudis | 11/25/05 | 1,000 | $24.06 |
| Koulouroudis | 11/28/05 | 200 | $24.05 |
| Koulouroudis | 11/30/05 | 1,000 | $23.99 |
| A. Stephanou | 11/30/05 | 5,000 | $23.68 |
| K. Paparrizos | 12/2/05 | 300 | $23.96 |

On December 2, 2005, at 1:26 p.m., G. Paparrizos called Stephanou for two minutes.
The Koulouroudis accounts and A. Stephanou had never traded in ABS common stock
before these dates.

30.     On December 7, 2005, the Cerberus-Supervalu consortium informed ABS
in writing that it did not believe that an acquisition of ABS at a price in excess of its then-
current market price per share was feasible.  This confidential letter contained negative
information that was not publicly released.  Due to his participation in the acquisition,
Stephanou had access to the information contained in this letter.

31.     That same day, on December 7, 2005, Stephanou made numerous
telephone calls to Koulouroudis and G. Paparrizos.  Specifically, Stephanou placed two
telephone calls to G. Paparrizos starting at 2:14 p.m., each lasting one minute, and G.
Paparrizos called Stephanou at 2:32 p.m. for one minute.  Stephanou also called
Koulouroudis for one minute at 3:10 p.m.

32.     On the same day, the A. Stephanou account, the K. Paparrizos account and
the Koulouroudis accounts sold their entire ABS positions:

12

| Individual | Date | Number of Shares Sold | Average Price |
|---|---|---|---|
| A. Stephanou | 12/7/05 | 5,000 | $23.86 |
| A. Stephanou | 12/7/05 | 20,000 (sold short) | $23.96 |
| K. Paparrizos | 12/7/05 | 440 | $23.50 |
| Koulouroudis | 12/7/05 | 17,775 | $23.38 |

33.     That same day, the A. Stephanou account covered 5,000 of the shares sold short.

34.     Two days later, on December 9, 2005, Stephanou again had numerous telephonic communications with Koulouroudis and G. Paparrizos. Specifically, Stephanou called Koulouroudis at 9:35 a.m. for one minute, at 11:43 a.m. for one minute, and at 8:34 p.m., Stephanou spoke with Koulouroudis for three minutes. Stephanou also called G. Paparrizos at 10:41 a.m. for one minute, and G. Paparrizos called Stephanou at 11:09 a.m. for one minute. That same day, A. Stephanou, the K. Paparrizos account and the Koulouroudis accounts all purchased ABS common stock:

| Individual | Date | Number of Shares Purchased | Average Price |
|---|---|---|---|
| Koulouroudis | 12/9/05 | 39,585 | $23.53 |
| A. Stephanou | 12/9/05 | 63,000 | $23.57 |
| K. Paparrizos | 12/9/05 | 500 | $23.44 |

35.     The next business day, on December 12, 2005, CVS officially joined the Cerberus-Supervalu consortium; however, this information was not publicly announced. On the same day, G. Paparrizos and the K. Paparrizos account purchased ABS common stock. On December 19, 2005, Stephanou called Koulouroudis twice, once at 10:01 a.m. for four minutes and once at 3:24 p.m. for three minutes. The following day, December 20, 2005, the Koulouroudis accounts purchased ABS common stock. The details of the trades follow:

| Individual | Date | Number of Shares Purchased | Average Price |
|---|---|---|---|
| G. Paparrizos | 12/12/05 | 1,200 | $23.69 |
| K. Paparrizos | 12/12/05 | 500 | $23.68 |
| Koulouroudis | 12/20/05 | 7,500 | $23.94 |

36.     On December 22, 2005, ABS' board of directors considered and rejected the consortium's proposed acquisition.  Stephanou had at least seven telephone conversations with Koulouroudis and G. Paparrizos on that same day.  For example, Koulouroudis called Stephanou at 9:35 a.m. and spoke to him for two minutes. Stephanou then called Koulouroudis four times between 10:29 a.m. and 11:19 a.m.:  at 10:29 a.m. for one minute, at 10:31 a.m. for one minute, at 10:32 a.m. for one minute, and at 11:19 a.m. for two minutes.  Stephanou called Koulouroudis one last time on December 22 at 6:07 p.m. and they spoke for seven minutes.  Stephanou subsequently had a four minute telephone call with G. Paparrizos at 10:27 p.m.

37.     That same day, the A. Stephanou account, G. Paparrizos, the K. Paparrizos account, and the Koulouroudis accounts sold all of their ABS common stock:

| Individual | Date | Number of Shares Sold | Average Price |
|---|---|---|---|
| A. Stephanou | 12/22/05 | 33,650 | $22.99 |
| A. Stephanou | 12/22/05 | 25,000 (sold short) | $22.97 |
| G. Paparrizos | 12/22/05 | 1,200 | $22.42 |
| K. Paparrizos | 12/22/05 | 1,000 | $22.33 |
| Koulouroudis | 12/22/05 | 47,085 | $22.64 |

38.     On December 22, 2005, ABS common stock closed at $23.28 per share.

39.     The next day, on December 23, prior to the open of trading, the consortium and ABS issued press releases announcing the termination of discussions regarding the potential sale of ABS.  That day, ABS common stock opened at $19.97 per share and the high was $20.85 per share.  As a result of this news, ABS' stock price dropped approximately 12%, from the closing price of $23.28 on December 22, 2005, to

a closing price of $20.54 on December 23, 2005. Further, the volume increased approximately 17% from 29,932,700 shares on December 22, 2005, to 35,144,600 shares on December 23, 2005.

40.     As a result of their activities, A. Stephanou, G. Paparrizos, K. Paparrizos, and Koulouroudis avoided losses and earned actual profits in the following amounts:

| Individual | Date | Approximate Losses Avoided | Approximate Profits |
|---|---|---|---|
| A. Stephanou | 12/23/05 | $132,000 | $73,000 |
| G. Paparrizos | 12/23/05 | $2,000 | |
| K. Paparrizos | 12/23/05 | $2,000 | |
| Koulouroudis | 12/23/05 | $99,000 | |

41.     During the following few weeks, discussions between ABS and the consortium were revived, and the consortium worked on a revised proposal. On January 9, 2006, the consortium held a nonpublic kick-off meeting to discuss a renewed and revived acquisition. That same day, Stephanou called Contorinis at 12:51 p.m. and they talked for four minutes. Beginning on that same day and continuing to January 18, 2006, the Jefferies Paragon Fund whose trading, upon information and belief, was directed by Contorinis, purchased 2,675,000 shares of ABS stock at an average price of $22.18 per share, the total cost of which was $59 million.

42.     The next day, on January 10, 2006, Stephanou called Koulouroudis at 9:37 p.m. and they spoke for six minutes. On January 11, the Koulouroudis accounts and A. Stephanou started to purchase ABS stock again:

| Individual | Date | Number of Shares Purchased | Average Price |
|---|---|---|---|
| A. Stephanou | 1/11/06 | 29,000 | $21.83 |
| Koulouroudis | 1/11/06 | 39,805 | $21.87 |

43.     Two days later, on January 13, 2006, Stephanou called G. Paparrizos at

10:13 a.m. for two minutes. From January 13 through January 18, A. Stephanou, G. Paparrizos, the K. Paparrizos account, and the Koulouroudis accounts increased their ABS common stock positions:

| Individual | Date | Number of Shares Purchased | Average Price |
|---|---|---|---|
| A. Stephanou | 1/13/06 | 2,000 | $22.84 |
| G. Paparrizos | 1/13/06 | 1,200 | $22.55 |
| K. Paparrizos | 1/13/06 | 600 | $22.65 |
| Koulouroudis | 1/13/06 | 3,000 | $22.61 |
| K. Paparrizos | 1/17/06 | 600 | $22.76 |
| Koulouroudis | 1/18/06 | 1,000 | $22.89 |

44.     On January 18 and 19, 2006, there were approximately sixteen telephone calls between Stephanou and Contorinis. On those same days, the Paragon Fund, whose trading, upon information and belief, was directed by Contorinis, sold approximately 675,000 shares of ABS stock at an average price of $23.76 per share. From January 9, 2006, continuing through January 17, 2006, Stephanou and Contorinis had approximately twenty-four telephone conversations.

45.     On January 19, 2006, the Wall Street Journal published an article citing anonymous sources stating that a consortium of private-equity investors and Supervalu submitted a new bid to acquire ABS at slightly more than $26 per share.

46.     On January 20, the Paragon Fund, whose trading, upon information and belief, was directed by Contorinis, purchased another approximately 500,000 shares of ABS stock at an average price of $24.11 per share. That same day, ABS issued a press release announcing that it had received a bid from a consortium that had previously submitted an offer for the company in December.

47.     On Friday, January 20, 2006, ABS common stock closed at $24.11 per share.

48.     From January 20 through January 23, 2006, Stephanou and Contorinis had approximately ten telephone conversations. In total, between January 9, 2006, and January 23, 2006, Stephanou and Contorinis had approximately fifty telephone conversations.

49.     On Monday, January 23, 2006, prior to the opening of trading, ABS, Supervalu, and CVS each issued a press release officially announcing the acquisition of ABS by the consortium at $26.29 per share. That day, ABS common stock opened at $24.85 per share and reached a high of $25.42 per share. As a result of this announcement, ABS common stock closed at $25.42 per share, up 5.43% from the closing price of $24.11 per share on the preceding business day. Further, the volume increased approximately 321% from 10,836,800 shares on January 20, 2006, to 45,578,700 shares on January 23, 2006.

50.     During the two days immediately following the announcement on January 23, the A. Stephanou account, G. Paparrizos, the K. Paparrizos account, the Koulouroudis accounts, and Contorinis, on behalf, and for the benefit, of the Paragon Fund, closed out of their ABS positions entirely:

| Individual | Number of Shares Sold | Average Price | Approximate Actual Profits |
|---|---|---|---|
| G. Paparrizos | 1,200 | $25.16 | $3,000 |
| K. Paparrizos | 1,200 | $24.84 | $3,000 |
| Koulouroudis | 43,805 | $24.96 | $132,000 |
| A. Stephanou | 32,000 | $24.86 | $95,000 |
| Contorinis, on behalf, and for the benefit, of the Paragon Fund | 2,500,000 | $25.07 | $7,200,000 |

51.     As a result of all of their trading in ABS, the parties avoided losses and

17

earned the following approximate actual profits:

- A. Stephanou: $300,000
- G. Paparrizos: $5,000
- K. Paparrizos: $5,000
- The Koulouroudis accounts: $231,000
- Contorinis, on behalf, and for the benefit, of the Paragon Fund: $7,200,000

52.     The confidential information Stephanou provided the tippees regarding the
ABS acquisition was material.  For the foregoing and other reasons, a reasonable investor
would have viewed this information as being important to his or her investment decision
and a significant alteration of the total mix of information made available to the public.

53.     Stephanou knew or was reckless in not knowing that the information about
the ABS acquisition that he learned in the course of his employment was material and
nonpublic, and had been disclosed to him with the expectation that he owed a fiduciary
duty or similar duty of trust and confidence.  By tipping this material nonpublic
information about ABS to A. Stephanou, G. Paparrizos, K. Paparrizos, Koulouroudis, and
Contorinis, who then traded on the basis of this information, Stephanou knowingly or
recklessly breached this duty.  Alternatively, Stephanou breached this duty by trading in
the account of his father, A. Stephanou, on the basis of this material nonpublic
information.

54.     A. Stephanou, G. Paparrizos, K. Paparrizos, Koulouroudis, and Contorinis
knowingly or recklessly received from Stephanou material nonpublic information about
the ABS acquisition and assumed the duty to maintain that information in confidence.
Upon information and belief, A. Stephanou, G. Paparrizos, K. Paparrizos, Koulouroudis,
and Contorinis knew that Stephanou, by virtue of his employment at UBS, had access to
material nonpublic information and that he was under a duty to keep that information

18

confidential.  In addition, A. Stephanou, G. Paparrizos, K. Paparrizos, Koulouroudis, and

Contorinis knew that Stephanou had disclosed material nonpublic information in

violation of Stephanou's duty to keep that information confidential.  By trading on the

information received by Stephanou, A. Stephanou, G. Paparrizos, K. Paparrizos,

Koulouroudis, and Contorinis breached the duty they inherited.

## II.    Insider Trading Ahead of the ELK Acquisition

### A.    Stephanou Possessed Material Nonpublic Information about the ELK Acquisition

55.    ELK was a manufacturer of roofing and building products.  Prior to its

acquisition, ELK was headquartered in Texas and its common stock traded on the New

York Stock Exchange under the ticker symbol, "ELK."  In the six months prior to its

announcement on November 6, 2006, that it was exploring strategic alternatives, the daily

trading volume in ELK averaged 267,879 shares and the daily stock price averaged

$27.15 per share.

56.    On August 17, 2006, during a Board of Directors meeting in Dallas,

Texas, ELK's board engaged UBS to act as its financial advisor during the process of

ELK's review of its strategic alternatives.

57.    Upon information and belief, UBS agreed to maintain in confidence all

information related to ELK's review of its strategic alternatives.  Stephanou was aware

that he owed a duty to maintain the confidentiality of information provided to him and

UBS by ELK and abstain from trading based on that information or to disclose that

information to others.

58.    UBS attended the August 17, 2006, meeting telephonically and two senior

investment bankers at UBS, including the Managing Director under whom Stephanou

19

worked on the ABS acquisition ("Managing Director"), were assigned to work on the strategic exploration and any potential acquisition. Both individuals were colleagues of Stephanou's at UBS, and worked in the New York City office of UBS at the same time as Stephanou. Telephone records evidence that Stephanou and the Managing Director had telephone communications during the relevant time period.

59.     Upon information and belief, Stephanou learned material nonpublic information about the acquisition of ELK: because he was assigned to advise ELK on the potential acquisition; through communications with other employees at UBS who advised ELK on the acquisition, including his two former colleagues from New York City; and/or by virtue of his access to UBS' internal files relating to ELK.

60.     On September 21, 2006, individuals from UBS, including the Managing Director and another senior member of the deal team with whom Stephanou maintained telephone contact, attended a Board of Directors Meeting in which ELK's board instructed ELK's management and UBS to commence a nonpublic solicitation process of contacting potential acquirers.

### B.   Stephanou Tipped his Friends and Relative with Material Nonpublic Information Regarding the ELK Acquisition, Each of Whom Traded

61.     On that same day, September 21, 2006, A. Stephanou began buying shares of ELK. Between September 21, 2006 and October 31, 2006, A. Stephanou purchased a total of 13,700 shares of ELK at an average price of $27.13 per share. On September 27, 2006, at 11:40 a.m., Stephanou called Koulouroudis for approximately three minutes; between 12:14 p.m. and 12:31 p.m., Koulouroudis called, or attempted to call, Stephanou four times. On that same day, the Koulouroudis accounts began buying shares of ELK. Between September 27 and November 3, 2006, the Koulouroudis accounts bought a total

of 9,515 shares of ELK at an average price of $26.23 per share.  None of these tippees had ever traded in ELK common stock before these dates.

62.     On Friday, November 3, 2006, ELK common stock closed at $25.18 per share.

63.     On Monday, November 6, 2006, prior to the market open, ELK issued a press release announcing that it was exploring strategic alternatives and that it had hired UBS as a financial advisor to assist in this process.  That day, ELK common stock opened at $30.89 per share and its high was $32.25.  As a result of this announcement, the price of ELK stock increased 26% from the closing price on the preceding trading day to the closing price on the day of the press release, $31.71.  Further, the volume increased approximately 885% from 282,500 shares on November 3, 2006, to 2,782,000 shares on November 6, 2006.

64.     On November 6, 2006, A. Stephanou bought 6,300 additional shares of ELK for an average price of $31.67 per share, bringing the account's total position in ELK's common stock to 20,000 shares.

65.     On November 6, 2006, at 9:59 a.m., Stephanou called Koulouroudis for approximately three minutes.  The Koulouroudis accounts began buying that same day and, between November 6 and November 15, 2006, the Koulouroudis accounts bought 3,350 additional shares of ELK for an average price of $31.45, bringing the Koulouroudis accounts' total positions in ELK stock to 12,865 shares.

66.     On November 13 and November 14, 2006, the K. Paparrizos account bought 2,000 shares of ELK common stock at an average price of $32.37.

67.     On November 15, 2006, ELK common stock closed at $33.20 per share.

68.     The next day, on November 16, 2006, ELK publicly announced that it had received a buyout offer of $35 per share in cash from Building Materials Corporation of America ("BMCA").  That day, ELK common stock opened at $35.30 per share and its high was $36.85.  As a result of this announcement, ELK common stock closed at $35.96, up 8.31% from the closing price of $33.20 the previous day.  Further the volume increased approximately 1197% from 171,900 shares on November 15, 2006, to 2,229,100 shares on November 16, 2006.

69.     That same day, the K. Paparrizos account sold all 2,000 of his shares of ELK common stock for $36.49 per share, earning total actual profits of $8,240.

70.     Two weeks later, on November 27, 2006, the K. Paparrizos account purchased 1,500 shares of ELK common stock at an average price of $35.75 per share and, on November 28, G. Paparrizos purchased 950 shares of ELK common stock at an average price of $35.55 per share.

71.     On November 30, 2006, the A. Stephanou account sold all 20,000 of his shares of ELK stock at an average price of $36.02, earning total actual profits of $149,154.

72.     On December 6, 2006, between 11:47 a.m. and 12:13 p.m., Koulouroudis called, or attempted to call, Stephanou three times.  Between December 6 and December 13, 2006, the Koulouroudis accounts sold 3,230 of their shares of ELK stock for an average price of $36.14 per share, bringing their remaining position in ELK stock to 9,635 shares.

73.     On December 18, 2006, prior to the market open, a press release was issued announcing that ELK had agreed to be acquired by The Carlyle Group for $38 per

share in cash -- which was $3 higher than the original offer. That day, ELK common stock opened at $38.48 per share and its high was $38.95. As a result of this announcement, ELK stock closed at $38.81, up 8.26% from the closing price of $35.85 on the preceding business day. Further, the volume increased approximately 748% from 243,600 shares on December 15, 2006, to 2,065,900 shares on December 18, 2006.

74.     That same day, at 10:12 a.m., Koulouroudis called Stephanou for approximately two minutes. Also on that day, the Koulouroudis accounts sold 7,535 shares of ELK common stock for an average price of $38.50 per share. On January 3, 2007, the Koulouroudis accounts sold their remaining 2,100 shares of ELK common stock for an average price of $41.00 per share. In total, the Koulouroudis accounts earned actual profits of approximately $138,000 from trading in ELK common stock.

75.     On December 18, Stephanou called G. Paparrizos at 12:37 p.m. and the two spoke for six minutes. That same day, the K. Paparrizos account sold his 1,500 shares of ELK common stock for an average price of $38.24 per share, and G. Paparrizos sold his 950 shares of ELK common stock for an average price of $38.60 per share, earning total actual profits of approximately $4,000 and $3,000, respectively.

76.     In total, the A. Stephanou account, G. Paparrizos, the K. Paparrizos account, and the Koulouroudis accounts made actual profits of approximately $302,000 on the ELK acquisition.

77.     The confidential information Stephanou provided the tippees regarding the ELK acquisition was material. For the foregoing and other reasons, a reasonable investor would have viewed this information as being important to his or her investment decision and a significant alteration of the total mix of information made available to the public.

78.    Stephanou knew or was reckless in not knowing that the information about the ELK acquisition that he learned in the course of his employment was material and nonpublic, and had been disclosed to him with the expectation that he owed a fiduciary duty or similar duty of trust and confidence. By tipping this material nonpublic information about ELK to A. Stephanou, G. Paparrizos, K. Paparrizos, and Koulouroudis, who then traded on the basis of this information, Stephanou knowingly or recklessly breached this duty. Alternatively, Stephanou breached this duty by trading in the account of his father, A. Stephanou, on the basis of this material nonpublic information.

79.    A. Stephanou, G. Paparrizos, K. Paparrizos, and Koulouroudis knowingly or recklessly received from Stephanou material nonpublic information about the ELK acquisition and assumed the duty to maintain that information in confidence. Upon information and belief, A. Stephanou, G. Paparrizos, K. Paparrizos, and Koulouroudis knew or were reckless in not knowing that that Stephanou, by virtue of his employment at UBS, had access to material nonpublic information and that he was under a duty to keep that information confidential. In addition, A. Stephanou, G. Paparrizos, K. Paparrizos, and Koulouroudis knew that Stephanou had disclosed material nonpublic information in violation of Stephanou's duty to keep that information confidential. By trading on the information Stephanou provided, A. Stephanou, G. Paparrizos, K. Paparrizos, and Koulouroudis breached the duty they inherited.

## III.    Insider Trading Ahead of the NHI Acquisition

### A.    Chakrapani Possessed Material Nonpublic Information about the NHI Acquisition

80.    NHI, based in Murfreesboro, Tennessee, is a real estate investment trust that specializes in the purchase and leaseback of healthcare real estate and in the making

of mortgage loans to healthcare operators.  NHI's stock trades on the NYSE under the symbol "NHI."  In the six months prior to its announcement on October 10, 2006 that it was considering strategic alternatives, the daily trading volume in NHI stock averaged 78,131 shares and the stock price averaged $25.98 per share.

81.     On August 2, 2006, during a quarterly Board of Directors meeting, NHI's Chairman, CEO, and President advised NHI's board that he intended to present a proposal to the board, whereby he and a group of outside persons would acquire NHI. Following this board meeting, a Special Committee of NHI's board contacted counsel regarding representation of the Special Committee in connection with the proposed acquisition.  The next day, on August 3, 2006, the Special Committee's counsel contacted Blackstone and requested that Blackstone make a presentation to the Special Committee about Blackstone's experience in providing financial advisory services for companies during insider-led going private transactions.

82.     On August 11, 2006, Blackstone made its presentation to the Special Committee with Chakrapani, along with two other individuals, representing Blackstone.

83.     Blackstone was retained on August 15, 2006, to provide investment advisory services to NHI's Special Committee.  Chakrapani was a member of the team advising NHI on the acquisition.

84.     Chakrapani was also present at two subsequent NHI board meetings on September 12, 2006, and October 6, 2006.

85.     Upon information and belief, Blackstone agreed to maintain in confidence all information related to NHI's exploration of an acquisition.  Further, the firm states on its website that one of its "core principles" is "protecting client confidentiality."  Because

the financial advisory services firm owed a duty to maintain the confidentiality of information provided to it by its clients, such as NHI, the policies and procedures the financial advisory services firm distributed to employees included policies and procedures mandating that each employee maintain information concerning its clients in strict confidence.  In addition, upon information and belief, Blackstone's policies prohibited employees from using confidential information obtained during the course of employment when trading in their own account, or someone else's account, or disclosing the information to others.  Chakrapani was aware that he owed a duty to maintain the confidentiality of information provided to him and his financial advisory services firm by the firm's clients, including NHI, and to abstain from trading based on that information or disclosing that information to others.

**B.    Chakrapani Tipped Stephanou, who in Turn Tipped Others who Traded on the Basis of the Material Nonpublic Information about the NHI Acquisition**

86.    On October 2, 2006, at 10:38 a.m., Chakrapani had a forty-one minute telephone call with a U.K. mobile telephone number which, upon information and belief, was associated with Stephanou.

87.    On that same day, A. Stephanou purchased 2,000 shares of NHI common stock at an average price of $28.23 per share.  A. Stephanou purchased an additional 1,000 shares of NHI stock on the following day, October 3, for an average price of $28.34 per share.  A. Stephanou had never traded in NHI common stock before this date.

88.    On October 4, 2006, Stephanou called Chakrapani at 2:00 p.m. and the two spoke for seven minutes.  Stephanou also called Koulouroudis at 2:28 p.m. and spoke for approximately two minutes.

89.     That same day, A. Stephanou purchased an additional 5,000 shares of NHI common stock for an average price of $28.59 per share.  In addition, Koulouroudis also purchased 2,619 shares of NHI stock for the Koulouroudis accounts for an average price of $28.59 per share. ·The Koulouroudis accounts had never traded in NHI common stock before this date.

90.     On October 5, 2006, A. Stephanou made his final purchase of 1,000 NHI shares at an average price of $28.74 per share.  In total, A. Stephanou purchased 9,000 shares of NHI stock from October 2 through October 5 for $256,467 and at an average price of $28.50.

91.     On October 9, 2006, Stephanou and Chakrapani spoke on multiple occasions.  At 7:20 p.m., Stephanou called Chakrapani for one minute and, at 8:01 p.m., Chakrapani called Stephanou for one minute.  At 8:02 p.m., Stephanou called Chakrapani and the two spoke for sixteen minutes.

92.     On October 9, 2006, NHI common stock closed at $29.05 per share.

93.     On October 10, 2006, NHI publicly announced that its Board of Directors had formed a Special Committee of independent directors, and had retained Blackstone as its financial advisor to evaluate strategic alternatives to enhance stockholder value. NHI further announced that it had received a buyout offer from its CEO offering $30 per share in cash, but stated that the proposal was inadequate.  On October 10, NHI common stock opened at $29.13 per share and reached a high of $30.15 per share.  NHI common stock closed at $29.93 per share, up 3.03% from the closing price of $29.05 per share on the preceding business day.  The volume increased approximately 373% from 36,400 shares on October 9, 2006, to 172,000 shares on October 10, 2006.  On October 11, the

first trading day after the official press release, NHI opened at $29.93 per share and reached a high of $31.20 per share. The stock closed at $30.70 per share, up 2.57% from the closing price of $29.93 per share on October 10. The volume increased approximately 422% from 36,400 shares on October 9, 2006, to 189,900 shares on October 11, 2006.

94.     On October 10, 2006, the A. Stephanou account sold all 9,000 of its NHI shares for an average price of $29.94 per share.

95.     On October 10, 2006, Koulouroudis called Stephanou at 11:11 a.m. and the two spoke for approximately one minute. That same day, the Koulouroudis accounts sold 1,619 NHI shares for an average price of $29.87 per share and sold the remaining 1,000 shares the next day on October 11, 2006, for an average price of $30.25 per share.

96.     As a result of their trading activities, A. Stephanou made total actual profits of approximately $13,000 and the Koulouroudis accounts made total actual profits of approximately $4,000. In total, A. Stephanou and the Koulouroudis accounts made actual profits of approximately $17,000 on the NHI transaction.

97.     The confidential information regarding the NHI acquisition that Chakrapani provided to Stephanou, who then passed it to A. Stephanou and Koulourodis, was material. For the foregoing and other reasons, a reasonable investor would have viewed this information as being important to his or her investment decision and a significant alteration of the total mix of information made available to the public.

98.     Chakrapani knew or was reckless in not knowing that the information about the NHI acquisition that he learned in the course of his employment was material and nonpublic, and had been disclosed to him with the expectation that he owed a

fiduciary duty or similar duty of trust and confidence. By tipping this material nonpublic information about NHI to Stephanou, who then tipped A. Stephanou or traded in his account, and Koulouroudis, who either traded in the Koulouroudis accounts or tipped his family members, who traded on the basis of this information, Chakrapani knowingly or recklessly breached this duty.

99.    Stephanou knowingly or recklessly received from Chakrapani material nonpublic information about the NHI acquisition and assumed the duty to maintain that information in confidence. Upon information and belief, Stephanou knew or was reckless in not knowing that Chakrapani, by virtue of his employment at Blackstone, had access to material nonpublic information and that he was under a duty to keep that information confidential. Stephanou also knew or was reckless in not knowing that in giving this information to Stephanou, Chakrapani was breaching this duty.

100.    In addition, when Stephanou tipped A. Stephanou, and Koulouroudis about the material nonpublic information regarding NHI, they knew or were reckless in not knowing that the information regarding the potential acquisition was confidential information that Stephanou received from someone who had a duty to keep that information confidential. In receiving this information, they, too, inherited a duty to keep it confidential. By tipping the information to others, or trading in A. Stephanou's account, Stephanou breached the duty he inherited to keep this information confidential. By trading on the information received from Stephanou, A. Stephanou breached the duty he inherited and Koulouroudis breached the duty he inherited, either by trading in the Koulouroudis accounts or by tipping his family members.

IV.     **Stephanou, Chakrapani, and the Tippees Breached Duties to Maintain the Information in Confidence**

101.    UBS assumed and owed a duty to maintain the confidentiality of information provided to it by its clients, Cerberus and ELK. Accordingly, in the course of his employment, Stephanou not only agreed to, but was required to, maintain in confidence information about ABS' and ELK's pending transactions and abstain from trading based on that information or disclosing that information to others.

102.    Stephanou knew or was reckless in not knowing that the information about the ABS and ELK acquisitions that he learned in the course of his employment was material and nonpublic, and had been disclosed to him with the expectation that he owed a fiduciary duty or similar duty of trust and confidence. By misappropriating and giving this material nonpublic information about ABS and ELK to his tippees, who then traded on the basis of this information, or by trading in his father's account, Stephanou knowingly or recklessly breached this duty.

103.    A. Stephanou, G. Paparrizos, K. Paparrizos, Koulouroudis, and Contorinis, who knowingly or recklessly received from Stephanou confidential information about the ABS and ELK acquisitions, assumed the duty to maintain that information in confidence. Upon information and belief, each tippee knew that Stephanou, due to his employment and position at UBS, had access to material nonpublic information and that he was under a duty to keep that information confidential. In addition, each tippee knew that Stephanou had disclosed material nonpublic information in violation of Stephanou's duty to keep that information confidential. By trading, each tippee breached this duty.

104.    Stephanou derived a direct or indirect personal benefit from disclosing the material nonpublic information to A. Stephanou, G. Paparrizos, K. Paparrizos,

Koulouroudis, and Contorinis, all of whom were friends, former colleagues or a relative.

105. Alternatively, Stephanou's investment bank and its employees became temporary insiders as a result of their participation on the ELK deal team. When Stephanou, as a temporary insider, disclosed material nonpublic information to A. Stephanou, G. Paparrizos, K. Paparrizos, and Koulouroudis about the pending ELK acquisition, or traded in his father's account, he breached a duty of trust and confidence to ELK and its shareholders to keep such information confidential.

106. NHI hired Blackstone in connection with its efforts to explore strategic alternatives, including the possible sale of the company. Blackstone assigned Chakrapani to work on the NHI transaction and, as a result, Chakrapani obtained access to material nonpublic information solely for the purpose of assisting NHI. Accordingly, Chakrapani became a temporary insider and fiduciary of NHI and its shareholders. Chakrapani owed a duty to maintain the confidence of any nonpublic information about NHI's pending transaction that he learned in the course of providing services to NHI and abstain from trading based on that information or disclosing that information to others.

107. Chakrapani breached his duty to NHI by disclosing material nonpublic information about the NHI acquisition to Stephanou. Chakrapani knew or was reckless in not knowing that the information about the NHI acquisition that he learned in the course of his employment was material and nonpublic, and had been disclosed to him with the expectation that he owed a fiduciary duty or similar duty of trust and confidence. By misappropriating and giving this material nonpublic information about NHI to Stephanou, who in turn tipped the information to others, and may have traded on it in his father's account, Chakrapani knowingly or recklessly breached this duty.

108.    Stephanou, who knowingly or recklessly received from Chakrapani confidential information about the NHI acquisition, assumed the duty to maintain that information in confidence.  Stephanou knew that Chakrapani, due to his employment and position at Blackstone, had access to material nonpublic information and that he was under a duty to keep that information confidential.  By tipping others with this information or trading in A. Stephanou's account, Stephanou breached this duty.

109.    A. Stephanou and Koulouroudis, who knowingly or recklessly received from Stephanou confidential information about the NHI acquisition, assumed the duty to maintain that information in confidence.  Upon information and belief, A. Stephanou and Koulouroudis knew or were reckless in not knowing that the information regarding the potential acquisition was confidential information that Stephanou received from someone who had a duty to keep that information confidential.  By trading, A. Stephanou breached the duty he inherited.  Kolouroudis breached the duty he inherited by either trading in the Koulouroudis accounts or by tipping his family.

110.    Chakrapani derived a direct or indirect pecuniary benefit or a reputational benefit from disclosing the material nonpublic information to Stephanou.  In addition, Stephanou derived a direct or indirect pecuniary benefit or a reputational benefit from disclosing the material nonpublic information to A. Stephanou and Koulouroudis.

### FIRST CLAIM FOR RELIEF

### Violations of Section 17(a) of the Securities Act

111.    The Commission realleges and incorporates by reference each and every allegation in paragraphs 1 through 110, inclusive, as if they were fully set forth herein.

112.    Defendants Stephanou, A. Stephanou, G. Paparrizos, K. Paparrizos, and

32

Koulouroudis, by engaging in the conduct described above, knowingly or recklessly, in connection with the offer or sale of securities, by the use of the means or instruments of transportation, or communication in interstate commerce or by use of the mails, directly or indirectly:

      (a)     employed devices, schemes or artifices to defraud;

      (b)     obtained money or property by means of untrue statements of material facts, or omissions to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and/or

      (c)     engaged in transactions, practices or courses of business which operated or would operate as a fraud or deceit upon the purchaser.

      113.    By engaging in the forgoing conduct, Defendants Stephanou, A. Stephanou, G. Paparrizos, K. Paparrizos, and Koulouroudis violated Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)].

## SECOND CLAIM FOR RELIEF

### Violations of Section 10(b) of the Exchange Act and Rule 10b-5 thereunder

      114.    The Commission realleges and incorporates by reference each and every allegation in paragraphs 1 through 113, inclusive, as if they were fully set forth herein.

      115.    Defendants Stephanou, Chakrapani, A. Stephanou, G. Paparrizos, K. Paparrizos, Koulouroudis, and Contorinis, by engaging in the conduct described above, knowingly or recklessly, in connection with the purchase or sale of securities, directly or indirectly, by use of the means or instrumentalities of interstate commerce, or the mails, or the facilities of a national securities exchange:

(a)     employed devices, schemes or artifices to defraud;

(b)     made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and/or

(c)     engaged in acts, practices, or courses of business which operated or would operate as a fraud or deceit upon any person in connection with the purchase or sale of any security.

116.     By engaging in the foregoing conduct, Defendants Stephanou, Chakrapani, A. Stephanou, G. Paparrizos, K. Paparrizos, Koulouroudis, and Contorinis violated Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)], and Rule 10b-5 [17 C.F.R.§ 240.10b-5], thereunder.

## PRAYER FOR RELIEF

**WHEREFORE**, the Commission respectfully requests that this Court enter a Final Judgment:

## I.

Permanently restraining and enjoining Defendants Stephanou, A. Stephanou, G. Paparrizos, K. Paparrizos and Koulouroudis from violating Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)], and Defendants Stephanou, Chakrapani, A. Stephanou, G. Paparrizos, K. Paparrizos, Koulouroudis, and Contorinis from violating Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)], and Rule 10b-5 [17 C.F.R.§ 240.10b-5], thereunder;

**II.**

Ordering Defendants Stephanou, Chakrapani, A. Stephanou, G. Paparrizos, K. Paparrizos, Koulouroudis, and Contorinis to disgorge the unlawful trading profits and losses avoided that were derived from the activities set forth in this Complaint, together with prejudgment interest thereon;

**III.**

Ordering Defendants Stephanou, Chakrapani, A. Stephanou, G. Paparrizos, K. Paparrizos, Koulouroudis, and Contorinis to pay a civil penalties pursuant to Section 21A of the Exchange Act [15 U.S.C. § 78u-1], or in the alternative Section 21(d)(3) of the Exchange Act [15 U.S.C.§ 78u]; and

**IV.**

Granting such other and further relief as the Court may deem just and appropriate.

Respectfully submitted,

Daniel M. Hawke
Elaine C. Greenberg
Tami S. Stark  (TS-8321)
Kingdon Kase
Mary Etheridge Hansen (ME-9947)
Colleen K. Lynch
Kay B. Lee

Attorneys for Plaintiff

**SECURITIES AND EXCHANGE
COMMISSION**
Mellon Independence Center
701 Market Street, Suite 2000
Philadelphia, PA  19106
Telephone: (215) 597-3100
Facsimile: (215) 597-2740

Dated: February 5, 2009